# EXHIBIT 1

**Appendix XII-B1**



## CIVIL CASE INFORMATION STATEMENT
### (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Robert L. Ebby, Esquire | (856) 616-2170 | Mercer |

| FIRM NAME (if applicable) | |
|---|---|
| Hangley Aronchick Segal & Pudlin | DOCKET NUMBER (when available) |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 20 Brace Road, Suite 201 Cherry Hill, NJ 08034 | Complaint |

RECEIVED APR 29 2011

JURY DEMAND ☐ YES ■ No

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Montclair State University, Plaintiff | Montclair State University v. Oracle USA, Inc. |

| CASE TYPE NUMBER (See reverse side for listing) | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ■ NO |
|---|---|
| 599 | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ YES ■ No | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES ■ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) ☐ NONE ■ UNKNOWN |
|---|---|

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ■ YES ☐ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain) ☐ FAMILIAL                    ■ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☐ YES ☐ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ YES ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED? ☐ YES ■ No | IF YES, FOR WHAT LANGUAGE? |

**I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).**

ATTORNEY SIGNATURE:

Effective 01/03/2011, CN 10517-English

page 1 of 2

HANGLEY ARONCHICK SEGAL & PUDLIN, P.C.
20 Brace Road, Suite 201
Cherry Hill, NJ 08034-2634
Telephone (856) 616.2100
Fax (856) 616.2170



| | |
|---|---|
| **MONTCLAIR STATE UNIVERSITY** | **SUPERIOR COURT OF NEW JERSEY** |
| **Plaintiff,** | **LAW DIVISION – MERCER COUNTY** |
| **v.** | |
| **ORACLE USA, INC.** | **DOCKET NO.** |
| **Defendant.** | **COMPLAINT** |

Plaintiff Montclair State University (the "University"), for its Complaint against

defendant Oracle USA, Inc. ("Oracle"), alleges as follows:

## INTRODUCTION

1.      This action concerns Oracle's breach of contract, gross negligence, willful

misconduct, and fraud in failing to implement an integrated enterprise resource planning

computer system (the "ERP System") for the University.  The ERP System was to replace the

University's twenty-five year-old aging computer systems and was an integral part of the

University's plan to improve its administrative and student services capabilities as New Jersey's

second largest public university.  The ERP System would enable the University to have a

common computer platform that would consolidate and manage the vast majority of the information and data needed for the University to run its operations. By having a common platform, the University could improve its planning and budgeting capabilities, maintain better administrative controls over its spending, improve services to its students by making course work, financial aid, and other information more readily available and accessible, improve its human resource systems processing and reporting, improve reporting of information for financial and other decision making, and have a fully enabled web solution that provided for increased productivity for University employees and significant service improvements to students. In reliance upon the schedule prepared by Oracle, the project, known as the Bell Tower Initiative or "BTI Project," was to be implemented over a twenty five (25) month period.

2.     In reliance on Oracle's representations regarding its ability to complete the project on time and within budget, the University contracted with Oracle to provide the software and services to implement the BTI Project. Oracle failed to deliver key implementation services, caused critical deadlines to be missed, refused to make available computer resources that it had promised, failed to deliver properly tested software, and, overall, failed to manage properly the project. As a result of Oracle's breaches and its refusal to cure its failures after many requests to do so by the University, the University was forced to suspend the BTI Project, terminate Oracle's contract, and seek to hire a replacement systems integration company to complete the BTI Project. This delay has added significant time to the implementation of the BTI Project and will increase the University's costs for the BTI Project by more than $10,000,000. Oracle's breaches and conduct have further subjected the University to additional costs, losses, and damages in the form of increased internal project costs, the cost of sustaining the University's legacy system

during the extended period of time to complete the BTI Project, and the loss of expected benefits that would result from successful implementation of the BTI Project.

## THE PARTIES, JURISDICTION, AND VENUE

3.      The University is a public university organized under the laws of the State of New Jersey located at 1 Normal Avenue, Montclair, New Jersey and is maintained for the purpose of providing higher education in the liberal arts, sciences, and various professional areas in accordance with N.J. Stat. §§ 18A:64-1, *et seq.*

4.      Oracle is a Colorado corporation with its principal place of business in Redwood City, California.

5.      This Court has jurisdiction over this action under Article VI, Section 3 of the New Jersey Constitution.

6.      Venue in this Court is proper pursuant to R. 4:3-2(a)(2) because the University is a state agency whose funding and contract approval emanate from the State Legislature, which is located in this county.  In addition, Oracle and the University contractually agreed to be subject to New Jersey law.

## BACKGROUND

### A.      Oracle's Proposal to Complete the BTI Project

7.      In or about October 2007, the University issued a request for proposals (the "RFP") to software companies that specialize in enterprise resource systems for higher education institutions.  The RFP described the various systems the University wanted to replace, including those for financial management, human resources, student administration, data warehousing, budgeting, enterprise portal, and user productivity kit ("UPK") training.  The RFP contained a list of over 3,000 business and technical requirements that the University determined were important for the new computer system to meet (the "MSU Business Requirements").  The terms

3

of the RFP required each responding bidder to identify which of their software products could meet each individual MSU Business Requirement. The University then used the RFP responses and relied upon the bidder demonstrations of system functionality to determine which software vendor had the product that could best meet the needs of the University.

8.     In or about May of 2008, Oracle and another leading software firm responded to the RFP by providing best and final offers to provide the software and implementation services to install the ERP System. The RFP required each of the bidders to propose fixed fee bids and further required each bidder to separate the price of software licenses and maintenance from the price for the implementation services.

9.     Based on the bidders' responses and the assurances provided by Oracle, the University's Evaluation Committee selected Oracle to provide a PeopleSoft suite of products and implementation services. These products included Oracle's PeopleSoft Financial Management System ("FMS"), Human Capital Management ("HCM"), Hyperion (for budgeting), Client Relationship Manager ("CRM") and Campus Solutions ("CS"), Data Warehouse and Analytics, Enterprise Portal, and UPK Training Modules (for training users on how to use the computer systems) (collectively, the "Oracle Software"). The University's Board of Trustee's authorized the award of a contract to Oracle on July 24, 2008 subject to final negotiation of a written agreement with Oracle. Oracle and the University failed to finalize the written agreement by November of 2008, and the University issued an addendum to the RFP on January 26, 2009 requesting best and final offers from Oracle and the other leading software firm who responded to the RFP. In or about February of 2009, Oracle and the other leading software firm provided their best and final offers. In or about April of 2009, the University's Evaluation Committee again selected Oracle for the BTI Project.

B.    <u>**The Agreement Between the University and Oracle**</u>

10.    In connection with the University's existing system requirements, on February 27, 2009, Oracle and the University entered into an Ordering Document to purchase Oracle database and technical software products in the amount of $319,152, as well as an Oracle License and Services Agreement (the "LSA") and an amendment ("Amendment One") to the LSA.

11.    In or about April of 2009, Oracle and the University negotiated the terms of several contracts for the purchase of Oracle Software and implementation services for the BTI Project.  On May 29, 2009, the parties entered into three (3) additional Ordering Documents – one for additional database and technical software products and support in the amount of $1,548,192.81, a second for the license of the Oracle Software and support in the amount of $2,469,301.79, and a third for implementation services in the amount of $15,750,000.  The Ordering Document for the implementation services (the "Services Ordering Document") incorporated by reference the LSA, Amendment One, a second amendment to the LSA ("Amendment Two"), and a Fixed Price Exhibit, dated May 31, 2009 (the "Fixed Price Exhibit" or "FPE").[1]

12.    In the Fixed Price Exhibit, Oracle, among other things, made the following promises:

> Using the Oracle-recommended staffing resources set forth in **Attachment A**, and structured implementation methodologies to produce work products described in **Attachment B**, Oracle will provide implementation services according to the Timeline in **Attachment D** and the High Level Project Plan in **Attachment E** to enable MSU to implement . . . the software products MSU licensed and are listed in **Attachment I** at the time this Ordering Document is

---

[1] Because the contract documents are voluminous, are already in Oracle's custody, and contain information that Oracle may later contend is confidential, they have not been attached.  By excluding the contract documents from its Complaint, the University does not acknowledge or admit that they contain confidential information.

executed to meet the requirements specified and clarified in
**Attachment C-1**.

FPE at 1 ¶ 1(a).

13.    The Attachments referenced in the contract are important as they form the core of

Oracle's overall contractual commitments to the University.  A high level description of these

documents is provided below:

| | |
|---|---|
| Attachment A | Staffing – The Staffing document was generated by Oracle and included the amount and type of resources Oracle recommended the University have to implement the Oracle Software.  This was important because the University needed to know before it signed the Services Ordering Document and FPE the number of resources needed to implement the BTI Project. |
| Attachment B | Work Products, Services and Deliverables – Description of work products, services, and deliverables for the project. |
| Attachment C-1 | MSU Business Requirements – This document comprised over 3,000 of the University's business and technical requirements.  Oracle stated in the FPE that it could meet the MSU Business Requirements with the Oracle Software (except a limited number that were expressly excluded). |
| Attachment D | Overall Project Timeline – The overall time frames in which the Oracle Software would be implemented.  This Attachment shows the entire project being completed by June 2011. |
| Attachment E | Preliminary, High-Level Project Plan and Milestones – This document included over 850 separate tasks that were required to implement the Oracle Software.  A more detailed plan was to be developed by Oracle post-contract signing. |
| Attachment G | Milestone Payments – The payment plan for the implementation services.  This plan reflected the dates that the University would make payment for Oracle achieving certain "milestone" events, such as completing a stage of testing of the software.  The payment plan generally was synchronized with the dates in the timeline document (Attachment D). |

6

Attachment J      Acceptance Form for Milestone Payments – Specifically, the form stated that the University's Chief Information Officer (or designated replacement when the CIO is not available) must sign the form to accept Oracle deliverables.

Attachment K      Methodologies – The description of the implementation methodologies that would be used by Oracle to implement the Oracle Software at the University.

14.     The FPE required Oracle to implement the Oracle Software in a manner that met the MSU Business Requirements.

15.     The Timeline and High Level Project Plan included the following completion dates for the four main pillars:

Hyperion - February 26, 2010;

Financial Management System - June 30, 2010;

Human Capital Management - December 29, 2010; and

Campus Solutions and CRM - June 24, 2011.

16.     Under the Services Ordering Document, Oracle agreed to perform all of the specified implementation services for the fixed fee of $15,750,000.  That fixed fee was to be paid in a series of milestone payments, each of which was tied to Oracle's satisfactory completion of a particular project deliverable.  FPE at 368-96.

**C.**     **Oracle Fails to Adequately Manage the BTI Project**

17.     Critical to the success of any large software implementation project, such as the BTI Project, is the establishment of a project management function and the provision of experienced and competent project managers who are capable of overseeing the entire project and ensuring that the implementation methodologies are consistently used and followed. Competent project managers must, among other things, identify and manage the risks that might delay the project or increase its cost, manage and mitigate any issues that are confronting the

project, and ensure that, where dependencies or links exist between two or more aspects of the project, the activities are properly sequenced and deadlines are timely met.

18.     Oracle contractually agreed to provide these project management services by using iProjects as the document repository.  However, Oracle was unable to create a workable document repository through iProjects after numerous failed attempts.  Rather than invest in an appropriate management tool and despite its concerns about the functionality of Blackboard as a document repository, Oracle requested by change order that a document repository be created using Blackboard because the University had a license to use that software.  The University agreed to use Blackboard as a document repository based upon representations by Oracle that it would be adequate and to mitigate any further delays due to Oracle's failed iProject approach. Blackboard proved ineffective as a project repository because it lacked many simple tools for managing project documentation (*e.g.*, change control, version tracking, etc.).

19.     Included as a separate set of activities in the FPE were the development of an overall program management plan (the "Integrated Project Management Plan"), as well as ongoing, monthly project management services for which Oracle would be paid $65,800 per month.  The Integrated Project Management Plan was to "integrate plans across projects to enable tracking of milestones, dependencies and activities."  The FPE required the Integrated Project Management Plan to be completed by Oracle and provided to the University "within the first few weeks of the project."  FPE at 19, ¶ 14.  This Integrated Project Management Plan was to be a key document supporting the project management function described above.  Oracle was responsible not only to produce the original Integrated Project Management Plan, but to keep it accurate and up-to-date throughout the course of the BTI Project.  FPE at 338.

8

20.     Oracle failed to produce the Integrated Project Management Plan.  The lack of an

Integrated Project Management Plan led to confusion amongst Oracle and University staff,

preventing either group from addressing resource and task conflicts and from identifying missing

integration tasks.   Since many of the University staff needed to be involved in multiple tracks,

the lack of an Integrated Project Management Plan created major concerns with scheduling their

time.  Although Oracle created a draft Integrated Project Management Plan, it never contained all

the project tasks, no resources were listed within it, and it showed fake target dates of CS being

completed in 2015, HCM in 2021, and FMS in 2020 – all well beyond the 25 month schedule

proposed by Oracle and contained within the Services Ordering Document.  Additional drafts of

Integrated Project Management Plans were only discovered after the University terminated

Oracle when the University found them in an electronic project repository.

21.     The University, concerned that the BTI Project would be delayed by the lack of

the Integrated Project Management Plan, repeatedly requested that Oracle produce the Integrated

Project Management Plan.  Although Oracle acknowledged its obligation to complete the

Integrated Project Management Plan, Oracle failed and/or refused to produce it.

22.     Oracle's contract also required it to deliver to the University's Project Manager,

on a monthly basis, reports "comparing actual scope, schedule and resources to planned scope,

schedule and resources; risk issues and mitigations."  Each of these items was important because,

if timely and accurately reported, it would provide the University with the information to ensure

that the BTI Project was being managed properly by Oracle.

23.     A critical success factor for a large scale implementation project such as the BTI

Project is the effective management of the issues and risks through an issues/risks log.  Oracle

did not manage the BTI Project's issues/risks logs and did not insist that many of their

9

issues/risks be documented within the log.  Because of this, issues and risks were not properly

documented, tracked, and addressed.  In fact, by September of 2010, the issues/risks log created

for the Project showed 8 items with a "high" severity were open for 82 days, 13 items with a

"critical" severity were open for 126 days, and 24 other items were open for 113 days.  Many

other risks and issues known by the University were either not contained in the issues/risks log at

all, or deleted from it by Oracle without any resolution.

24.     Instead, Oracle chose to embed issues and risks within weekly project status

reports, causing major issues and risks to be lost with simple project problems that required

minor fixes.  Throughout the course of the BTI Project, many risks or issues noted by the

University within the weekly status reports were unilaterally removed or downgraded by Oracle

without any resolution.  For example, in or about February of 2010, the University created a

weekly status report that showed the FMS system was coded "red" because it was behind

schedule (red designating there were significant problems).  Although Oracle's Project Manager,

Christian Kim, agreed with the University's status, Oracle's Lead Project Manager, Robert

Kohler, re-coded FMS to "yellow" (a less critical problem designation) at a project meeting but

failed to address the issues impacting the schedule, and the official report issued by Oracle

regarding status kept FMS coded yellow.  Ultimately, FMS failed to go-live as intended on July

1, 2010 and Oracle's unilateral change to the color coding in this report was an intentional act to

downplay the seriousness of the risk and mislead the other members of the BTI Project team.

25.     Oracle failed to provide accurate and timely project status reports to manage the

application tracks, creating constant uncertainty for the University regarding where they were in

the BTI Project, what tasks were to be done next, and who was responsible for what tasks.  The

project status reports Oracle did provide were oftentimes late and failed to include updated actual

scope versus planned scope, actual project schedules versus planned schedules, actual resources needs versus planned resource needs, updated project plans, budget tracking, issues/risks logs and mitigation strategies. As a result, the University was left without critical project-related information to ensure the BTI Project was being implemented on time and within budget.

26. Moreover, Oracle refused to integrate University tasks and resources into its report to help manage the BTI Project. Since University employees were performing their regular job functions, the University needed advance notice of the assignment of tasks and staffing for a particular need on the BTI Project. As a result of Oracle's failure to integrate University tasks into the reports, the University was constantly requested by Oracle to respond to tasks with less than 1 week's notice which created major last minute scheduling problems. Moreover, certain modules like Budgeting, Hyperion, and EPM were scheduled by Oracle too early making much of the work unusable. Lastly, Oracle sequenced project tasks to align with payment milestones and at the expense of industry accepted best practices for project testing and management.

27. The status reports and project plans Oracle did create had no standards in place which made cross project tracking difficult and the results reported inconsistent. Resource loading was inconsistently shown by Oracle and, because University resources were not included or generalized by using phrases like "HCM staff," there was no way to have an accurate picture of the entire project status, resources, and costs.

28. In response to complaints from the University, Oracle acknowledged that it had failed to meet its obligations under the FPE and randomly updated status reports and project plans after constant insistence by the University. Oracle treated the project planning report as a nuisance rather than the critically important tool it is for effective project management. As with

the Integrated Project Management Plan, Oracle failed and/or refused to deliver the status reports as required by its contract, and eventually failed and/or refused to deliver updated status reports in the inadequate format created by Oracle.

29.     Oracle required the University to use several Oracle-proprietary implementation methodologies as a condition of Oracle implementing the BTI Project.  These methodologies were described in Attachment K to the FPE and are known as the "Compass, Accelerated Compass, and Workbench Methodologies" (collectively, the "Oracle Methodologies").  FPE at 20, ¶ 17; *see* Oracle Proprietary Methodologies, FPE at 424-32.  Implementation methodologies are an important component of any complex software implementation project because they provide the overall structure of how services are to be delivered during the project.

30.     However, many of the Oracle staff assigned to the BTI Project were subcontractors who had no knowledge of the Compass Methodology, didn't understand it, and weren't effectively trained to use it.  When the University pointed to the Oracle Methodologies as requiring the missing status reports and project plans, certain Oracle employees finally admitted that they were not familiar with the Oracle Methodologies and were implementing the BTI Project the way they thought they should.

31.     Oracle's failure to supply accurate and up-to-date project status reports, in combination with Oracle's failure to provide an overall integrated project plan and failure to follow its Compass Methodology, created a situation in which, despite the University's expressed concerns regarding whether Oracle was going to meet the timelines for the BTI Project, the University could not assess whether the project was on track.  Oracle refused to provide the necessary project information upon which any assessment could be made but

constantly assured the University that the project was on track for being completed within the time periods stated in the contract.

32.    In addition to its lack of project management, Oracle continually rotated staff into and out of the BTI Project creating confusion on task and project duration and requiring work to be redone as new Oracle staff wanted to do things their way.  Specifically, Oracle assigned 129 people to the BTI Project during an approximately 12 month period, both on- and off-shore resources.  Most of the off-shore staff assigned to the project by Oracle worked part-time and often confused the BTI Project with other projects they were working on for other clients.  The FPE permits the University to request Oracle remove a particular consultant providing services to the BTI Project if the University reasonably believed that he/she was not providing services as warranted and Oracle, after notice, was unable to resolve such performance issues.  FPE at 21, ¶ 24.  The University voiced many complaints to Oracle regarding problems with the staff assigned and constant rotation of staff, all of which were ignored by Oracle.

33.    In addition, during 2010, Oracle undertook its own internal audit of the BTI Project.  Although the University was entitled to a copy of this audit report under the terms of the FPE and demanded a copy of the audit, Oracle refused to turn over a copy.

34.    Oracle represented to the University that the Project Manager assigned to the BTI Project had multiple certifications from the Project Management Institute ("PMI") and served on PMI's Global Corporate Council, which credentials and experience would assure the project was properly managed.  PMI is internationally recognized as being the "gold" industry standard for project management professional certification. Oracle touted these qualifications as a significant reason why the University should hire Oracle, and they were a significant factor in the University's ultimate decision.  PMI's Code of Ethics and Professional Conduct, sections 2.2.3

and 2.2.4 required Project Managers to fulfill the commitments they undertook, do what they said they would do, take ownership of errors and omissions, and make corrections promptly. Section 3.3 of the PMI Code also required Project Managers to negotiate in good faith and not exercise the power of their position to influence the decisions or actions of others in order to benefit personally at their expense. Section 5.2 of the PMI Code also required the Oracle Project Manager to earnestly understand the truth, be truthful in communications and conduct, and provide accurate information in a timely manner. Oracle's Project Manager failed to adhere to these components of the PMI Code of Ethics in the project management and failed to effectively provide the level of professional management skills that Oracle represented it would provide to the University for the BTI Project.

**D.**     <u>Oracle Fails to Deliver a Functional Financial Management System</u>

35.     The first major application set to go live was the FMS system. FMS was scheduled to be completed and placed into production (or go live) on July 1, 2010. The July 1, 2010 delivery date for FMS was selected because it corresponded with the beginning of the University's fiscal year. Implementing a financial system at any other time, other than a major accounting period ending date such as an interim quarter period, would create significant, complicated and unnecessary accounting work and significant additional conversion work.

36.     A necessary step in implementing FMS was to convert certain University financial data. Conversion activity was to commence in the February 2010 timeframe, which was important because later activities, such as testing, required the use of this converted data. The terms of Oracle's contract required Oracle to "host" the computer hardware (at an Oracle location) needed for the University to convert its data (the "Hosted Environment"). Yet, when it came time for Oracle to provide the Hosted Environment, Oracle refused to do so unless the University signed a third amendment that, among other things, could have operated to exculpate

Oracle from liability if Oracle breached its obligations to keep University data confidential. Oracle's proposed amendment was inconsistent with Oracle's obligation to maintain the University's data confidential under the terms of the parties' existing contract as well as applicable state and federal laws including, without limitation, the Family Educational Rights and Privacy Act.   As a result of Oracle's failure to comply with the express terms of its contract, the University was unable to utilize the hosting site to load testing and training data.

37.   Notwithstanding that these newly imposed terms and conditions were not necessary under the terms of the existing agreement, the University attempted to negotiate with Oracle in good faith so that it could access the Hosted Environment.  Ultimately those negotiations broke down when Oracle refused to consider any modifications proposed by the University to the third amendment drafted by Oracle.  When Oracle was questioned by the University as to why the terms in the third amendment were necessary given the fact that the parties had negotiated for months over the terms of their contract, Oracle's Vice President and General Manager Thomas Ball stated it was because "we just dropped the ball."  Accordingly, beginning in February 2010 and continuing thereafter, Oracle refused to provide the Hosted Environment, causing a direct and material delay on the ability to meet the FMS go-live timeframe and significantly delaying the HCM implementation schedule.  Ultimately, the University purchased and installed new hardware to host the Oracle instance.  However, Oracle's failure to comply with the terms of its contract impacted the testing schedule for FMS, one of the key drivers for the failure to go-live with FMS on July 1, 2010, and caused confusion around testing which was being done simultaneously of multiple environments.

38.   Oracle also refused to provide certain implementation services it was required to provide under the FPE.  Beginning in March 2010, Oracle was to take the lead role in defining

the security configuration to be included within the FMS application.   FPE at 45, 48, 50, 51 (Application Security Design, where Oracle is designated as the "Lead").   As in any computer system, establishing proper security controls and user privileges is critically important to ensure the systems are secure, users can carry out their assigned responsibilities, and that business process workflows are followed.

39.   In addition to the failure to provide the Hosted Environment for FMS when required and the failure to provide the security configuration activities, Oracle failed to follow proper design and testing procedures.   Pursuant to the FPE, there was a systematic approach defined for designing, then configuring, and then testing the software applications.   The first step was the design of the computer system to meet the requirements of the University.   Oracle led the design sessions where the MSU Business Requirements were discussed, after which design documents called "Conceptual Solution Design" ("CSD") documents were created.   Because the BTI Project was to be integrated among all the various components (*i.e.,* FMS, HCM, CS, *etc.*), these design sessions needed to take into consideration the design requirements of other software applications.   For example, the design of both FMS and CS systems need to take into account the data requirements for each software application.   Since Oracle knew how its systems worked and what information was captured by each software application, the University relied on Oracle to inform the University when this critical information was needed.   The University learned after the FMS, CS, and HCM CSDs were completed that Oracle failed to include within the CSDs critical data from all of these major applications to allow full integration.

40.   Once the software applications were designed, Oracle was obligated under the FPE to configure the Oracle Software to meet the design requirements as represented in the CSD document.   Oracle delivered the FMS configurations late, leaving the University with an

insufficient amount of time to test the FMS software applications, and without completing key components of the CSD.

41.     The contract between the parties required testing to be accomplished in a logical, incremental fashion, using generally recognized testing steps.  The first step is to "unit test" software, which means an individual software application is tested to see if it delivers the required functionality.  If that test passes, then the next test would involve a "systems integration test," which is a test to ensure that all the individual software applications work together and that information flows from one application to the other without malfunctions.  A critical component of systems integration testing is demonstrating that security configuration is working properly and, if not, User Acceptance Test ("UAT") will inevitably fail.  Also, during this test, interfaces, or software programs that are created to transfer information from one application to another, are tested.  There are other tests along the way, but the last test that is critically important is the UAT.  In the UAT, actual users test the software applications to make sure they work without any major malfunctions.  Only when all these tests pass, should the software applications be placed into live use.

42.     The FPE also states that the Compass Methodology requires a testing strategy to define the goals and purpose of each level of testing for unit, integration, system, and performance testing, and that for each type of test, the goals approach and participants will be clearly defined using a testing strategy document.  Oracle failed to comply with the terms of its contract by failing to provide testing plans against which the University could assess whether or not the testing was successful.

43.     Oracle materially failed on virtually every aspect of the testing program.  Oracle's failures included:

a. Delivering the configured software late to the University, thereby leaving insufficient time to test the software and not according to the timelines originally established for testing;

b. User and security configurations were never completed so UAT could not be completed;

c. Interfaces were delivered late making it difficult to test whether the interfaces worked properly;

d. Delivering additional software modules late in the process, making it impossible to perform proper testing before July 1, 2010; and

e. A ripple effect of Oracle's late delivery of all of FMS components prevented the University from having sufficient time to train its staff to use and test the software.

44. Given the lateness in testing, Oracle recommended that the University conduct the various tests concurrently, a practice that is not supported by Oracle's own methodologies or any generally-recognized industry standards. Although the University rejected Oracle's offer as contrary to industry practices and contrary to Oracle's contractual obligations, the University did perform a test of the software, and the systems integration failed. Despite the failure of the test, Oracle recommended that the University go live, even though security was not ready to be tested and even though there existed major defects in the software applications that were not being corrected by Oracle in a timely manner. Specifically, Oracle failed to prepare a security design strategy. As a result, user login and security profiles were not created at the time UAT was to begin. Therefore, UAT was delayed several days and once begun it was necessary to expand individual user security access (*i.e.*, additional security roles were added to profiles) to enable users to "get a pass" result on the test scripts. This practice allowed users broader security access to the system than justified by the users' job responsibilities, opening up the system to potential errors or misuse and thereby placing the University's multi-million dollar budget at risk.

45.     The Institute of Electrical and Electronics Engineers ("IEEE") established IEEE 829 which defines an international best practices standard for testing procedures to guide the development of any testing strategy document.  The IEEE 829 standard requires test completion criteria to be established before the next level of testing begins.  IEEE 829 further states that test suspension criteria should be established if the number or type of defects reaches a point where the following testing has no value, makes no sense to continue to the test, and further testing would be a waste of resources.  Oracle failed to follow the IEEE 829 standard or its Compass Methodology in creating any testing standards.  Moreover, and pursuant to these standards, when the University's systems integration tests failed, industry standards would require UAT testing to be suspended.  When UAT failed, all further testing should have stopped and, pursuant to these standards, go-live should never have been recommended by Oracle.  Accordingly, Oracle's failure to develop testing criteria violated both acceptable industry standards and its Compass Methodology incorporated by reference into the terms of its contract.

46.     On June 18, 2010, the University provided written notice to Oracle, recapping the parties' discussions and reciting the problems with the security configurations, interfaces, data conversion, missing software, unresolved defects, and untested elements of the FMS environment.  The University stated that it would make every effort to go live on July 1, 2010, but if it could not, it would be due to Oracle's failures, which had been previously stated.  Oracle's plan to go live despite the existence of numerous known defects created a host of additional risks, including the possibility of significant data loss and the risk that the University could be left without functioning financial software for an indeterminate period of time if critical errors were identified after FMS was in production.  Because FMS was the backbone of the University's fiscal planning and day-to-day operations, the University could not risk the

19

possibility that its financial data would be lost or corrupted or that it would be left without functioning financial management software.  In addition, the lack of a functioning security module created a grave risk that the integrity of the University's financial controls would be compromised.

47.    With no real assurances from Oracle that the problems would be corrected, on or about June 30, 2010, the University made the decision to delay the go live of the FMS applications.  During this time period, Oracle took no responsibility or accountability for its own failures; instead it attempted to blame the University.

48.    Because of its lack of adequate project management and oversight, Oracle was unable to provide any adequate contingency plan in a timely manner to salvage this important milestone and get the BTI Project back on track.

E.    **Oracle Threatens to Walk Off the Project**

49.    From July to the end of September 2010, numerous communications and several meetings occurred between the parties, during which time the University repeatedly requested that Oracle provide an Integrated Project Management Plan that included a new, achievable timeline to complete the BTI Project.  These discussions culminated in a presentation made by Oracle to the University on September 27, 2010, during which Oracle stated that to complete the BTI Project, Oracle required an additional $7,923,000 above and beyond the $15,750,000 fixed price Oracle originally agreed to in the FPE and accompanying Services Ordering Document. Oracle alleged a number of factors, all University based, that caused the failure of the project, but an examination of the factors indicated that either they had nothing to do with the delay or were precipitated by Oracle's own failures.  Oracle failed to identify a single item of failure on Oracle's part in that report.

50.     Oracle's unilateral assessment that an additional $7,923,000 was required to complete the BTI Project was made despite the fact that it was contrary to the change control process set forth in the parties' agreement, which required that any expanded scope or fee change be agreed to in writing before any additional expense was incurred or work was performed.

51.     On or about September 28, 2010, Oracle sent an email to the University stating that it was "Oracle's intent to suspend (or stop) work on the MSU ERP Project if we do not have an amended contract that reflects the new timelines, increases in the scope and effort. The last day that Oracle staff will be on the project is October 28, 2010." Oracle made this demand without even following the change control process, or providing a proposed amendment to its contract to the University for review. Again, Oracle breached its contractual obligation to follow the change control process. For example, there were 244 change orders demanded by Oracle in the approximate amount of $1.1 million that were either functional requirements already specified in the FPE or like-for-like exchanges for customizations ("CEMLIs") which are included within the fixed price according to the terms of the FPE. Oracle's unilateral threat to withdraw its implementation staff must be viewed as an attempt by Oracle to coerce the University into agreeing to pay more for the fixed fee project than Oracle was entitled to under the agreement.

52.     Oracle also made demands for payment for incomplete deliverables that the University had not accepted by submitting invoices dated October 29, 2010 and November 16, 2010.

53.     The FPE specifies that a deliverable is accepted only if an Acceptance Certificate is signed by the University's Chief Information Officer. FPE at 29, § 4. If an Acceptance Certificate is not signed by the Chief Information Officer, the FPE states that other indicia of

acceptance shall not "be effective for purposes of payment and shall not be effective against MSU." *Id.*

54.    In addition to the foregoing, Oracle has demanded payment for numerous deliverables, which were either not delivered to the University, delivered as incomplete, never accepted by the University, or never invoiced to the University.

55.    The University has no obligation to pay for such deliverables.

**F.    Due to Oracle's Failures, the University Was Forced to Terminate the Services Ordering Document and FPE and Retain a Replacement Vendor to Fix Oracle's Deficiencies and Complete the BTI Project**

56.    In compliance with the terms of the LSA, by letter dated October 11, 2010, the University provided written notice to Oracle that Oracle had materially breached the Services Ordering Document and FPE and specified the nature of the breaches. *See* letter from V. Van Baaren to S. Holdridge dated October 11, 2010 (the "Breach Letter"). The University also demanded that Oracle immediately cure these breaches within 30 days and further provide a statement of adequate assurances. *Id.*

57.    In addition to the foregoing, the Services Ordering Document states that "[n]either party shall terminate this ordering document related to the other party's uncured material breach until discussion have been elevated to the parties' applicable Executive Sponsors, and either of the representatives in good faith concludes that amicable resolution through continued negotiation of the matter at issue does not appear likely." Services Ordering Document ¶ 5.

58.    Pursuant to the terms of the Services Ordering Document, the University, represented by its President and its attorneys, met with Oracle's representatives on October 25, 2010 to discuss Oracle's breaches. At that meeting, the University reinforced its demand that Oracle cure its breaches and that it had until November 11, 2010 to do so. During that meeting, Oracle refused to acknowledge its past breaches and continued its attempt to wrongfully increase

the project cost by millions of dollars.  Therefore, the University concluded in good faith that amicable resolution through continued negotiation was unlikely.

59.     The Services Ordering Document also required the parties to work in good faith to transition the project if there was a termination.  Services Ordering Document ¶ 7.  The transition provisions of the Services Ordering Document included very specific and detailed obligations of Oracle to identify and then make available in the University's project repository the various project items that it had created.

60.     During the 30-day period following the University's October 11, 2010 notice, Oracle failed to cure the material breaches identified by the University and committed new breaches of its contract by failing to comply with the detailed transition process in the Services Ordering Document.  In addition, after October 11, 2010, when the University notified Oracle of its default and demanded a cure, Oracle began "dumping" partially completed deliverables on the University, for which it demanded payment after the University had terminated the contract.  At this time, Oracle personnel were still on site but were not attempting to cure the breach, choosing instead to conduct "business as usual."

61.     On November 1, 2010, Oracle staff appeared on campus to continue previously scheduled data mapping and work on HCM (*i.e.*, business as usual), all of which was inappropriate given the project failures and breaches previously identified by the University.  Oracle was advised by the University that Oracle staff should not be conducting business as usual but rather should either be working on a cure of the breaches or assisting with the transition.   Otherwise there would be no purpose for the Oracle staff to be at the University.  After consulting with Oracle's legal counsel, Douglas Konselman, Oracle staff returned to the University's Chief Information Officer's office, handed the Chief Information Officer the access

keys, and said "here you go" and "we're out of here." Oracle's personnel walked off the project on November 1, 2010 and never returned.

62.     By November 11, 2010, Oracle had failed and refused to acknowledge that it had breached its contract with the University, failed to take any corrective action to cure, and failed to even propose a plan to cure the breaches identified by the University. Therefore, by letter sent November 11, 2010 and after the expiration of the 30-day cure period required by the contract, Oracle was notified that the University was terminating the Services Ordering Document and the FPE for cause and would seek a replacement vendor to complete the project.

63.     In the event of a termination, the terms of the Services Ordering Document and FPE required the following:

> Oracle shall generate a compiled list of all contract deliverables, CEMLI programs [custom programming], and software module configurations, setup parameters and values.
>
> The compiled list will serve as a checklist for turning over to MSU deliverables, CEMLI programs, and module configurations. Each entry will be checked as 'completed', 'work in progress', or 'not started'. Additionally the iProjects repository of meeting minutes will be provided to MSU.
>
> The compiled inventory list will also serve as a catalog of items facilitating MSU's verification that all work was checked into MSU project library. An updated issues log will be turned generated [sic].
>
> Oracle will also provide a listing of the document version, code version, release level and patch log to MSU.

Services Ordering Document, ¶ 7. Oracle was also under a contractual obligation to mitigate the damages resulting from any termination, and the turning over of a list of deliverables would have helped mitigate at least in part the University's damages. Although the University made numerous requests for Oracle to comply with its obligations to provide the above information, Oracle initially refused and subsequently provided incomplete and inaccurate lists.

64.     The lists referenced above were important because the University wanted

potential bidders for completion of the BTI Project to be able to review the project deliverables

to determine whether they would be able to re-use the deliverables.  The University hoped that if

the bidders could use the previously prepared project deliverables from Oracle, it would lower

the ultimate price for the successor vendor to complete the implementation services Oracle was

contractually obligated to perform.  The reason Oracle's cooperation was critical was because the

LSA states in Section C that the University has a non-exclusive, non-assignable, perpetual,

royalty-free right to use services "upon payment."  In numerous communications, the University

advised Oracle in clear terms that if a successor vendor determined the deliverable was usable,

the University would pay for it.   However, Oracle continually refused to permit any viewing of

the deliverables by the bidders or other third parties without the University first agreeing to pay

for all the deliverables, whether or not they were completed, functional, or usable.  The

University did not want to pay for project deliverables that might turn out to be useless but

Oracle would not permit the University to allow bidders to review these deliverables without first

agreeing to pay for them, and threatened to sue the University for infringement if it did so.  If

Oracle had cooperated with the University by permitting potential replacement vendors to view

all of the deliverables created by Oracle, it could have reduced the replacement vendor's efforts

to complete the BTI Project and mitigated the University's costs and damages.  Despite the

University's repeated requests for cooperation from Oracle, Oracle absolutely refused to

cooperate and the mitigation of costs and damages was not possible.  Notwithstanding, and in the

hope of mitigating the costs of completing the implementation of FMS by a different vendor, the

University forwarded a check to Oracle on December 22, 2010 in the amount of $368,846.00 as

payment of deliverables FMC4, FMC5, HPC1 and HPC3 so that they could be examined by

potential bidders.  Consequently, when the University solicited bids for completion of the

implementation of the BTI Project on February 11, 2011, it made available to bidders only the

deliverables which had been paid for by the University.

65.    Based on the feedback from the potential replacement bidders, it appears that

most of the work performed by Oracle and paid for by the University (including the deliverables

paid for post-termination as a result of Oracle's refusal to cooperate with transition) will not be

re-useable, as the work failed to meet industry standards.  The University previously paid Oracle

more than $6,000,000 under the FPE for these deliverables. Based on the initial bid responses

from the replacement vendors, the direct, out-of-pocket cost to complete the BTI Project will,

depending on the vendor ultimately selected, exceed Oracle's bid by at least $10,000,000 and as

much as $20,000,000.

66.    Although it had already charged the University more than $6,000,000 for

implementation services for a non-functional system and despite its abysmal performance under

the Services Ordering Document and FPE, Oracle has filed a notice under the New Jersey

Contractual Liability Act of its intent to file suit seeking $5,300,000 in additional payments from

the University for: a) work that was not authorized by change order pursuant to the terms of the

parties' agreement, and b) for work partially completed after October 11, 2010 that was not

associated with curing Oracle's defaults.  Oracle claims the work partially completed after

October 11, 2010 is payable because it delivered Acceptance Certificates to the University and

notice of deficiencies of those deliverables was not issued by the University to Oracle within the

time period generally prescribed by the FPE.  The University rejects Oracle's assertion that this

work was authorized or is payable.  The University's October 11, 2010 notice of default and

demand for cure set forth in great detail the numerous deficiencies of Oracle's performance and

therefore is in compliance with the terms of the FPE. In addition, as a matter of law, Oracle may

not claim payment for work it delivered after October 11, 2011 that is unrelated to a cure.

67.     Oracle has no basis for demanding or receiving any such payment.

## COUNT I
## BREACH OF CONTRACT

68.     The University incorporates by reference each of the preceding paragraphs as if

restated herein in its entirety.

69.     The Services Ordering Document and FPE are an enforceable contract between

Oracle and the University.

70.     As described above, Oracle materially breached the Services Ordering Document

and FPE by, among other things, failing to meet deadlines, manage the BTI Project, and

complete deliverables as well as by demanding payment – under threat of abandoning the project

– for payments not owed.

71.     Based on the extreme failures to provide services, including proper project

management; refusal to provide proper reporting; failure to provide services after multiple

demands; withholding services where there was no legitimate basis to do so; and staffing with

Oracle employees who had no knowledge of or experience with the methodologies that were

being used to implement the BTI Project, Oracle has been grossly negligent and has engaged in

willful misconduct in the performance of its obligations under the Services Ordering Document

and FPE.

72.     As described above, Oracle has failed to correct its breaches, entitling the

University to recover all fees paid to Oracle for services under the FPE.

73.     As a result of Oracle's breaches of the Services Ordering Document and FPE, the

University has suffered damages and has been harmed in multiple ways, including, without

limitation, by overpaying for incomplete or unusable deliverables and being forced to incur significant additional cost to remedy Oracle's failures and complete the BTI Project.  In addition, the University has been subjected to repeated business interruptions caused by Oracle's failed attempts to go live with incomplete and unstable portions of the system and has been unable to realize the expected administrative efficiencies and cost savings that were to result from the successful implementation of the BTI Project.

WHEREFORE, the University respectfully demands judgment against Oracle on this Count, together with compensatory damages, court costs, and such other relief as this Court deems appropriate.

## COUNT II
## DECLARATORY JUDGMENT

74.     The University incorporates by reference each of the preceding paragraphs as if restated herein in its entirety.

75.     Pursuant to the Declaratory Judgment Act, this Court has authority to issue a declaration of the parties' respective rights and status under a contract where an actual case or controversy exists.  N.J. Stat. § 2A:16-50, *et seq.*

76.     As described above, an actual controversy exists between the University and Oracle on the basis of Oracle's claim that the University has breached the Services Ordering Document and FPE.

77.     The University has paid for all deliverables for which it was required to pay and is not in breach of the Services Ordering Document and FPE.

78.     As a party in material breach of the Services Ordering Document and FPE, Oracle has no legal right to seek continued performance from the University by way of additional payment.

WHEREFORE, the University respectfully demands judgment in its favor on this Count, together with a declaration that the University properly terminated the Services Ordering Document and FPE and is not in breach of the Services Ordering Document and FPE, court costs, and such other relief as this Court deems appropriate.

## COUNT III
## GROSS PROFESSIONAL NEGLIGENCE

79.    The University incorporates by reference each of the preceding paragraphs as if restated herein in its entirety.

80.    Oracle and its employees held themselves out as experienced in the profession or trade of the design and implementation of complex integrated software systems such as the BTI Project.  As such, Oracle had a duty to exercise the skill and knowledge normally possessed by those in the profession, trade, or industry of the design and implementation of complex integrated software systems.

81.    The University reasonably relied on Oracle's representations of its qualifications and experience in selecting Oracle to implement the BTI Project.

82.    As discussed above, Oracle's performance fell far below the standard of care in the industry and Oracle has been grossly negligent and engaged in willful misconduct, including by staffing the BTI Project with inappropriate personnel who were unable to complete the work required of Oracle under the Services Ordering Document and FPE because of inexperience, poor supervision, lack of coordination and direction, and/or lack of competence.

83.    Oracle's failures and conduct have directly caused harm to the University, including, without limitation, the cost to the University of repairing the non-functional portions of the BTI Project that Oracle delivered, repeated business interruptions caused by Oracle's failed attempts to go live with incomplete and unstable portions of the system, and an inability to

realize the expected efficiencies and cost savings that were to result from the successful

implementation of the BTI Project.

WHEREFORE, the University respectfully demands judgment against Oracle on this

Count, together with compensatory damages, all court costs, and such other relief as this Court

deems appropriate.

**COUNT IV**
**IN THE ALTERNATIVE, LEGAL FRAUD**

84.     The University incorporates by reference each of the preceding paragraphs as if

restated herein in its entirety.

85.     In its response to the RFP and in the FPE and Services Ordering Document,

Oracle misrepresented material facts, including, *inter alia*:

a.  That it could complete the BTI Project using the resources set forth in Attachment

A to the FPE;

b.  That it could complete the BTI Project according to the timeline set forth in

Attachment D to the FPE;

c.  That it could complete the BTI Project for the fixed price set forth in the Services

Ordering Document;

d.  That the project management staff that Oracle provided would be competent,

experienced, and familiar with the Oracle Methodologies.

86.     At the times that it made these misrepresentations, Oracle knew or believed that

they were false.

87.     Oracle made these representations with the expectation and intent that the

University would rely on them in deciding whether or not to retain Oracle to complete the BTI

Project.

30

88.     In deciding to retain Oracle to complete the BTI Project, the University reasonably relied to its detriment on Oracle's representations, including the misrepresentations identified herein.

WHEREFORE, the University respectfully demands judgment against Oracle on this Count, together with compensatory damages, all court costs, and such other relief as this Court deems appropriate.

HANGLEY ARONCHICK SEGAL & PUDLIN, P.C.

By: _____
        Robert L. Ebby

Dated:  April 29, 2011.

## CERTIFICATION PURSUANT TO R.4:5-1

Upon the best of my knowledge and belief I hereby certify that there are no other actions or arbitrations related to this suit pending or presently contemplated.

## CERTIFICATION OF COMPLIANCE WITH RULE 1:38-7

I certify that any confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

## DESIGNATION OF TRIAL COUNSEL

Attorney Robert L. Ebby is hereby designated as Trial Counsel pursuant to R.4:25-4.

HANGLEY ARONCHICK SEGAL & PUDLIN, P.C.

By: _____
    Robert L. Ebby

Dated:  April 29, 2011.