***NOT FOR PUBLICATION***

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____

| | | |
|---|---|---|
| | : | |
| MONTCLAIR STATE UNIVERSITY, | : | |
| | : | Civil Action No.: 11-2867 (FLW) |
| Plaintiff, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| ORACLE USA, INC., | : | |
| | : | |
| Defendant. | : | |
_____ :

**WOLFSON, United States District Judge:**

Presently before the Court is Defendant's Motion to Dismiss Counts I, II, III, and IV of Plaintiff's Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court grants Defendant's motion with respect to Plaintiff's fraudulent inducement claim (Count I) and negligent misrepresentation claim (Count II), but denies the motion with respect to Counts III and IV of Plaintiff's Amended Complaint, which sound in contract.

## I.    FACTS AND PROCEDURAL HISTORY

The following facts are taken from Plaintiff's Amended Complaint.  As the complaint is expansive–with 151 paragraphs of allegations—I provide only an overview of the allegations here. More detail is discussed, where relevant, in the discussion section of this Opinion.

Plaintiff Montclair State University ("Montclair"), a higher education institution in the State of New Jersey, alleges that Defendant Oracle USA, Inc. ("Oracle") breached the parties' computer

1

software and services agreement by failing to properly implement Montclair's new integrated enterprise resource planning computer system (the "ERP System"). Am. Compl., ¶ 1. Montclair specifically alleges that, in 2006, it decided to replace its then-existing ERP System with a new system. *Id.* at ¶ 9. In seeking a primarily, "off-the-shelf" version of a system that it could use, *id.*, Montclair identified over 3,200 business requirements for the new system. Once it identified these requirements, Montclair issue a request for proposals ("RFP") to Oracle and two other software companies that develop ERP systems. *Id.* at ¶ 12. In its RFP, Montclair directed the bidders to specify which business requirements could be satisfied by the bidders' "Base Product," *i.e.*, an off-the-shelf product. *Id.* at ¶ 13.

According to the Amended Complaint, Oracle submitted its response to the RFP on January 8, 2008. *Id.* at ¶ 14. In its response, Oracle allegedly represented that its Base System would address the overwhelming majority of Montclair's business requirements; only 156 of the 3,200 could not be satisfied by the Base System. *Id.* at ¶¶ 14-15. Thereafter, on April 14-17, 2008, Oracle gave a live demonstration of its system to Montclair. *Id.* at ¶ 18. Montclair alleges that, at this demonstration, Oracle again represented that its Base System would address the vast majority of Montclair's business requirements.

Montclair asserts that Oracle made additional representations during the negotiation and bidding process. According to Montclair, one of its concerns in transitioning to a new ERP System was that it did not have enough personnel resources to devote to the project. During the negotiation and bidding process, Oracle represented to Montclair that Montclair's resources would be sufficient. *Id.* at ¶ 25. More than that, according to Montclair, Oracle represented that it could accelerate implementation of the ERP System even in light of Montclair's limited number of employees and

2

resources. *Id.* In this connection, Montclair alleges that "Thomas Ball, Oracle's vice president of Health and Higher Education, and K.C. Bacher, another Oracle vice president, during meetings held at the University from January 2008 through February 2009" made the acceleration and personnel-related representations. *Id.* at ¶ 26. Oracle referred to the accelerated schedule as its "Accelerated Compass Methodology." *Id.* at ¶ 27.

Montclair further asserts that Oracle misrepresented its intention to implement the agreement at the agreed-upon fixed price. *Id.* at ¶ 40. Following the negotiation and bidding process, the parties agreed to a fixed price of $15,750.00. *Id.* As explained in more detail below, however, once its work on the project began, Oracle demanded additional fees for work that it contended was beyond the scope of the parties' agreement. *Id.* at ¶ 42. Oracle's additional charges amount to another $7 million, although Oracle indicated that it was willing to accept approximately $4 million. Based on these post-agreement developments, Montclair alleges that "it may plausibly be inferred that," at the time the parties were finalizing their agreement, Oracle never intended to abide by the $15,750.00 fixed price term. *Id.* at ¶ 44.

Ultimately, based on the aforesaid representations and other factors, Montclair chose to enter into an agreement with Oracle for development and implementation of a new ERP System in around April of 2009. *Id.* at ¶ 45. The parties entered into several contracts that, altogether, comprise their agreement. Relevant here are the following contracts: (1) the Services Ordering Document, which governs Oracle's services relating to implementing the ERP System; (2) the Oracle License and Services Agreement (the "LSA"); (3) an amendment to the LSA ("Amendment One"); (4) a second amendment to the LSA ("Amendment Two"); and (5) a Fixed Price Exhibit (the "Fixed Price Exhibit" or "FPE"). *Id.* at ¶ 47. The LSA and Amendment One were executed by the parties on

February 27, 2009. *See* Kirby Decl., Exh. A ("LSA") at 18; *id.*, Exh. B ("Amendment One") at 6.[1] The Service Ordering Document was executed on May 29, 2009, *id.* at Exh. D at 3, and Amendment Two on May 30th, *id.* at Exh. C at 6. There is no date of execution specified on the face of the FPE. Rather, it states that it is an "[e]xhibit [that] incorporates by reference the terms of the Ordering Document ...." *Id.*, Exh. E at 1. In the Amended Complaint, Montclair alleges that this document is dated May 31, 2009. Am. Compl., ¶ 47.

Following execution of the agreement, Oracle began its work in developing and implementing Montclair's transition to the new ERP System. Montclair refers to this project as "the Bell Tower Initiative" or "BTI Project." *Id.* at ¶ 1. According to Montclair, the project was to be implemented over a twenty-five month period. *Id.*

While Oracle was working on the BTI Project, Montclair alleges that it was dissatisfied with Oracle's work on several fronts. Montclair asserts that it became apparent that Oracle's Base System did not possess the "critical functionality" that Oracle represented it would possess and that, contrary to Oracle's representations during the negotiation and RFP process, substantially more customization was required to meet Montclair's business requirements. *Id.* at ¶ 54. As a result of the additional customization required, Oracle did not meet the project's first "go-live date." *Id.* at ¶ 60. Moreover, Montclair alleges, Oracle was grossly negligent—if not incompetent— in its management of the BTI Project.[2] Oracle further failed to deliver a functional financial management

---

[1] While the Amended Complaint states that all of the contracts except for the FPE were executed on May 29, 2009, I pull my dates from the face of the contracts themselves. Since the contracts are integral to the complaint, I may rely on the contracts in deciding the instant motion to dismiss. *See infra* for a discussion of when a court may rely on documents that form the basis of a plaintiff's complaint.

[2] For example, while promising in the parties' agreement that it could provide project-management functions through iProjects, Oracle was not able to "create a workable

system as it promised it would in the parties' agreement.  *Id.* at ¶¶ 80-96.  Lastly, Montclair alleges that "Oracle's staff regularly engaged in dishonest and bad-faith business practices" by failing to take responsibility for problems, blaming Montclair for Oracle's own errors, and, most notably, repudiating their agreement and walking off the project on November 1, 2010 .  *Id.* at ¶¶ 97-115.

Montclair filed its initial complaint in the Superior Court of New Jersey, Law Division, Mercer County, on April 29, 2011.  Shortly thereafter, on May 18, 2010, Oracle removed the case to this Court.  Montclair filed its Amended Complaint on December 19, 2011, bringing several causes of action against Oracle: a fraudulent inducement claim (Count I), a gross negligent misrepresentation claim (Count II), two breach of contract claims (Counts III and IV), a breach of implied covenant of good faith and fair dealing claim (Count V), and a declaratory judgment claim (Count VI).  In the instant motion to dismiss, Oracle seeks to dismiss Counts I, II, III, and IV of the Amended Complaint for failure to state a claim, pursuant to  Fed. R. Civ. P. 12(b)(6).

## II.    STANDARD OF REVIEW

When reviewing a motion to dismiss, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court clarified the 12(b)(6) standard. Specifically, the Court "retired" the language contained in *Conley*

---

document repository through iProjects after numerous failed attempts. [But r]ather than invest in an appropriate management tool and despite its concerns about the functionality of Blackboard as a document repository, Oracle requested by change order that a document repository be created using Blackboard because the University had a license to use that software" though, ultimately, "Blackboard proved ineffective as a project repository" as well.  *Id.* at ¶¶ 61-62.

*v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* at 561 (quoting *Conley*, 355 U.S. at 45–46). Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 555. As the Third Circuit has stated, "[t]he Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest 'the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element'." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

In affirming that *Twombly* standards apply to all motions to dismiss, the Supreme Court recently explained the following principles. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, ――, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S.Ct. at 1950. The plausibility standard requires that "the plaintiff plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). Ultimately, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler*, 578 F.3d at 211.

6

Further, in evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). "The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." *Lum v. Bank of America*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) *abrogated on other grounds by Twombly*, 550 U.S. at 561–63. Importantly, however, while the Court may rely on these sort of documents in ruling on a motion to dismiss, none can be considered for the truth of the matter asserted therein. *Id.*

## III. DISCUSSION

Oracle focuses the bulk of its motion on Montclair's fraudulent inducement claim, arguing that the related doctrines of economic loss and parol evidence, along with the existence of an integration clause in the parties' agreement, bar Montclair's claim. Oracle further argues that the negligent misrepresentation and breach of contract claims should be dismissed, but, as its focus is on the fraudulent inducement claim, I start there.

### A. *Fraudulent Inducement Claim*

Oracle first argues that Plaintiff's fraudulent inducement claim is barred by New Jersey's economic loss doctrine.[3] Under New Jersey law, a plaintiff typically may not recover in tort for

---

[3]    The parties agree that New Jersey law governs Montclair's claims. In reaching a decision governed by New Jersey law, district courts consider decisions of the New Jersey Supreme Court, federal courts applying New Jersey law, the Appellate Division of the New Jersey Superior Court, and analogous decisions applying the law of other states in predicting how the New Jersey Supreme Court would decide questions of New Jersey law. *See, e.g., Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 406 (3d Cir. 2000); *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996); *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 459-60 (3d Cir. 1993). New Jersey trial court decisions constitute potentially persuasive but nonbinding authorities.

damages caused by a breach of contract: "The economic loss rule 'defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases.'" *Dean v. Barrett Homes, Inc.*, 406 N.J.Super. 453, 470, 968 A.2d 192 (App. Div. 2009) (quoting R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L.Rev. 1789 (2000)), *reversed on other grounds* 200 N.J. 207 (2009).

Montclair's fraudulent inducement claim consists of four types of misrepresentations that Montclair alleges Oracle made during the agreement negotiation process: (a) that Oracle's Base System would satisfy the overwhelming majority of Montclair's business requirements with little to no customization required; (b) that the personnel and related resources Montclair had available for the BTI Project were sufficient; (c) that Oracle intended to perform the implementation services under the agreement at the fixed-price of $15,750,000; and (d) that Oracle's own personnel and/or consultants hired to work on the project would be adequately trained in Oracle's Accelerated Compass Methodology.[4]

---

*See, e.g., Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 269 n. 9 (3d Cir. 1999) *superceded by statute on other grounds as stated in In re Raymour and Flanigan Furniture,* 405 N.J. Super. 367 (App. Div. 2009).

[4]     A fraudulent inducement claim consists of five elements: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment. *Metex Mfg. Corp. v. Manson*, No. 05–2948, 2008 WL 877870, at *4 (D.N.J. Mar. 28, 2008) (citing *Jewish Ctr. of Sussex County v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981)).

Oracle argues that each of these alleged misrepresentations relates to matters expressly addressed by the parties' agreement and, hence, that the economic loss doctrine mandates dismissal. Montclair, in contrast, argues that the economic loss doctrine does not apply to misrepresentations that precede commencement of the contract.   While this may generally be true, *see Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F.Supp.2d 557 (D.N.J. 2002) (reasoning that economic loss doctrine does not bar certain fraud in the inducement claims) (discussing, *inter alia*, *Alloway v. General Marine Industries, L.P.*, 149 N.J. 620 (1997)), only those pre-contractual misrepresentations that are *extraneous* to the parties' contract may be brought alongside a breach of contract claim.  *See Bracco*, 226 F.Supp.2d at 563; *see generally Chen v. HD Dimension, Corp.*, Civil No. 10-863, 2010 WL 4721514, *8-9 (D.N.J. Nov. 15, 2010) (discussing fraud in the inducement claims under the economic loss doctrine).

An alleged misrepresentation is extraneous to an agreement when it breaches a duty "separate and distinct from the performance" of the agreement's terms.  *Chen*, 2010 WL 4721514 at *9.  In other words, "an act that is in breach of a specific contractual undertaking would not be extrinsic, but an act that breaches some other duty would be." *Emerson Radio Corp. v. Orion Sales, Inc.*, No. CIV. A. 95–6455, 2000 WL 49361 (D.N.J. Jan. 10, 2000).   Hence, an alleged misrepresentation that "involve[s] a nonfulfillment of a warranty or guarantee contained within the contract itself" can not be said to be extraneous to the contract.  *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F.Supp.2d 521, 528 (D.N.J. 1998).  In short, "a plaintiff may be permitted to proceed with tort claims sounding fraud in the inducement so long as the underlying allegations

involve misrepresentations unrelated to the performance of the contract, but rather precede the actual

commencement of the agreement." *Chen*, 2010 WL 4721514 at *8.[5]

In this connection, I note that the Third Circuit has repeatedly described New Jersey's

economic loss doctrine, as it relates to fraud claims, as a "morass."  *See Gleason v. Norwest*

*Mortgage, Inc.*, 243 F.3d 130 (3d Cir. 2001).  In 1990, the circuit explained:

> The question of the continuing validity of fraud claims in cases
> involving frustrated economic expectations under New Jersey law is
> very complex and troublesome. The United States District Court for
> New Jersey unequivocally has held that the New Jersey Supreme
> Court's reasoning in *Spring Motors Distributors, Inc. v. Ford Motor
> Co.*, 98 N.J. 555, 489 A.2d 660 (1985), though not explicitly
> addressing fraud claims, "leads ... to the conclusion that, as between
> commercial parties New Jersey will not countenance" claims for
> fraud other than fraud in the inducement. *Unifoil Corp. [v. Cheque
> Printers and Encoders Ltd.]*, 622 F.Supp. [268,] 270-71
> [(D.N.J.1985)]. *Spring Motors* held that "as among commercial
> parties ... contract law, ... provides the more appropriate system [as
> compared to tort law] for adjudicating disputes arising from frustrated
> economic expectations." 489 A.2d at 673.
>
> Contrary to this proposition, the New Jersey Superior Court after
> *Spring Motors* has upheld fraud claims between commercial parties,
> *see Perth Amboy Iron Works, Inc. v. American Home Assurance
> Company*, 226 N.J.Super. 200, 543 A.2d 1020 (App.Div.1988), [ aff'd
> 118 N.J. 249, 571 A.2d 294 (1990)]. No New Jersey court, though,
> has explicitly considered whether these claims are barred by *Spring
> Motors*.

---

[5]       As an aside, I note that many courts in this district use the terms "extrinsic" and "intrinsic" to distinguish between fraud in the inducement and fraud in the performance claims. *See e.g., Beijing Gongmei Import & Export Co., Ltd. v. Ijbara*, Civil Action No. 10-cv-02821(SDW), 2012 WL 3228711, *7 (D.N.J. Aug. 6, 2012); *RNC Systems, Inc. v. Modern Technology Group, Inc.*, --- F.Supp.2d ----, 2012 WL 933134, *13 (D.N.J. 2012).  *See also Rainbow Apparel, Inc. v. KCC Trading, Inc.*, Civil Action No. 09-cv-5319 (DMC), 2010 WL 2179146, at *10 (D.N.J. May 26, 2010).  And, some courts use the term extrinsic and extraneous almost interchangeably.  In this opinion, I will use the term extraneous to describe those fraudulent inducement claims that may proceed alongside breach of contract claims.

*Id.* at 144 (quoting *Vanguard Telecom. v. Southern New England Telephone*, 900 F.2d 645, 654 (3d Cir. 1990)).

In the past twenty-two years, the New Jersey Supreme Court has still not expressed its view on what precise sort of fraud claims may proceed alongside breach of contract claims, despite the development within the District of New Jersey courts of the "extraneous to the contract" doctrine relating to fraudulent inducement claims. Nor have any appellate court decisions spoken directly to this development. In my view, District Courts would greatly benefit from the guidance of the New Jersey Supreme Court in this regard and it is hoped that the New Jersey Supreme Court will take the opportunity to clarify this area of law when the issue is next presented to the Court.[6]

Nevertheless, as noted in *Bracco, supra,* the Third Circuit has made clear that where the scope of state law is unsettled, federal courts are to adopt the approach that limits recovery rather than expands it. *See* 226 F.Supp.2d at 565 (citing *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002)). Following that dictate here, I rely upon the case law that uses the divining line of whether a fraudulent inducement claim is extraneous to the subjects addressed by the parties' agreement. *Accord id.*

The alleged misrepresentations here are not extraneous to the parties' agreement; to the contrary, the misrepresentations relate to Oracle's performance of the terms set forth in the FPE. With regard to the alleged misrepresentation that Oracle's Base System would satisfy most of Montclair's business requirements with little to no customization, that misrepresentation relates to language found in Attachment C-1 to the FPE, the cover page of which provides:

---

[6]     According to New Jersey Court Rule 2:12A-1, only the Third Circuit may certify questions to the New Jersey Supreme Court. District Courts do not have the discretion to certify questions directly.

> Included in this attachment are [Montclair']s requirements, the means of addressing each requirement . . . and appropriate comments that help to clarify requirements and the means that will be used to address them. Requirements listed in Attachment C-1 as "Not in Scope" or "Undefined" are not included within the scope of this Exhibit (except as addressed otherwise in the scope section of the Exhibit).

FPE at 57.  Following this cover page is a several-hundred page chart of 3,071 of Montclair's business requirements with Oracle's response to each requirement.  *Id.* at 58-329.

Similarly, with respect to the alleged misrepresentation that the personnel and related resources Montclair had available for the BTI Project were sufficient, the FPE expressly addresses Montclair's role in ensuring that it had sufficient resources.  By way of example, the FPE provides that "MSU is capable of and will fulfill all assigned obligations and complete all tasks assigned to it according to the project work plan and schedule."  *Id.* at 18, ¶ 2.  The FPE, further, provides that "[t]o support efficient organization and execution of the services, [Montclair] will . . . [p]rovide the project teams and resources specified in Attachment A to complete assignments according to the project work schedule."  *Id.* at 15, ¶ 2.  In Attachment A, titled Staffing, the FPE designates, *inter alia*, the number of staff need to perform particular tasks.  *Id.* at 33-43.  Attachment B also specifies which work product, services, and deliverables are Montclair's—as opposed to Oracle's—responsibility to complete, and whether Montclair is to take the "lead" or "participant" role on that responsibility.  *See id.* at 44-56.  Hence, it is clear from the face of the FPE, that Montclair's staffing resources are addressed in the parties' agreement.

Regarding the alleged misrepresentation that Oracle intended to perform the implementation services under the agreement at the fixed-price of $15,750,000[7], the FPE provides:

---

[7]    I focus on this alleged misrepresentation as an example because Montclair describes it, in its brief, as "Oracle's central misrepresentation."  Pl. Opp. at 16.

> Fees and Expenses. MSU agrees to pay Oracle a fixed fee of Fifteen Million Seven Hundred Fifty Thousand Dollars ($15,750,000.00) for services and Deliverables described in this Exhibit. Once a Deliverable identified in **Attachment G** is accepted or deemed accepted in accordance with Section 4 above, the corresponding payment specified in **Attachment G** becomes due and payable; this payment obligation shall become non-cancelable and the sum paid nonrefundable on the acceptance date. The fees set forth in **Attachment G** are inclusive of all expenses incurred by Oracle in its performance under this Exhibit, but are exclusive of taxes, if any, assessable under Amendment Two.

FPE at 29, ¶ 5 (emphasis in original).  In addition, changes in cost are also addressed by the parties' agreement.  *See* Services Ordering Document at 2, ¶ 5 (". . . Oracle shall not be obligated to perform tasks related to changes in time, scope, cost, or contractual obligations until you and Oracle agree in writing to the proposed change in a change order document or an amendment to this ordering document and/or the FPE."); *see also* FPE at 22, ¶ 40 (addressing change orders).  Therefore, the question of whether Oracle intended to abide by its fixed-price term is a topic addressed by the parties' agreement.

Lastly, the FPE addresses the subject relating to the alleged misrepresentation that Oracle's own personnel and/or consultants hired to work on the project would be adequately trained in Oracle's Accelerated Compass Methodology ("ACM").  The ACM is addressed in the FPE, which states that is designed to facilitate the implementation of "standard human resources management and financials [sic] management business processes."  *See* FPE, Attachment K at 430.  The FPE obligates Oracle to oversee the planning, structure, construct, and transition phases of the human resources and financial management aspects of the new ERP System transition.  *Id.*, Attachment K at 403-31.  In terms of personnel/consultant training, the FPE further makes clear that Oracle has

the discretion under the agreement to either utilize its existing personnel to meet its ACM

obligations under the agreement, or to supplement its workforce with specially–trained consultants:

> Oracle reserves the right to plan, assign and manage the Oracle resources as needed to deliver the scope [sic] on schedule. Oracle may supplement specific skill sets or temporarily re-assign an individual from the project whose skill set is not needed at the time. If the skill set becomes needed again, Oracle may bring in a different individual.

> MSU may screen, interview telephonically, and recommend candidates for Oracle Consulting key positions (program manager, project managers, senior functional consultant, and senior technical consultant). OC will give very serious consideration to MSU's recommendations in the spirit of good teamwork. However, on a fixed-price project, Oracle Consulting reserves the right to make all final decisions regarding Oracle staffing ....

*Id.* at 21, ¶¶ 23-24.  Hence, the parties' agreement expressly addresses Oracle's obligations

regarding its use of trained personnel to facilitate the ACM.

District of New Jersey cases have barred fraudulent inducement claims where, as here, "[t]he

actions complained of . . . are expressly provided by the terms of the contract."  *D&D Assoc.*,

*supra* at *36.  For example, in *RNC Systems, Inc. v. Modern Technology Group, Inc.*, --- F.Supp.2d

----, 2012 WL 933134, *12 (D.N.J. 2012), the court addressed an alleged misrepresentation about

the defendant's ability to support a certain automobile technology.  The defendant, allegedly,

represented that the technology would be "virtually flawless."  *Id.*  Yet, in reality, the technology

proved to be difficult to support and it caused fires in the automobiles in which it was installed.  The

parties' agreement, however, expressly addressed the defendant's support responsibility for the

technology, by stating:  "The Parties understand and agree that [Defendant] shall be responsible for

manufacturing, marketing, distributing, selling and supporting Licensed Products in the Territory

within the Field using its best effort."  *Id.* at *13.  Concluding that the alleged misrepresentation was

"addressed squarely within the language of the [a]greement and was, therefore, "not unrelated to the performance of the contract as required under the economic loss doctrine," the court dismissed the fraudulent inducement claim. *Id.* at *14.

Here, while acknowledging the existence of the contract language quoted above that speaks to the substance of all four types of Montclair's fraudulent inducement allegations, Montclair argues that its fraud in the inducement claim is extraneous to the agreement because it asserts "pre-contractual representations about the defendant's capabilities." Pl. Opp. at 19. Montclair relies heavily on the decision in *Metex Mfg. Corp. v. Manson*, 2008 U.S. Dist. LEXIS 25107, 2008 WL 877870 (D.N.J. Mar. 28, 2008), which I have described in a prior opinion as upholding a challenge to a fraudulent inducement claim because there was "a genuine dispute whether Defendants misrepresented its [sic] ... capabilities with knowing falsity and with the intention that [the Plaintiff] rely [thereupon]." *Id.* at *14 (emphasis added) *cited in Dutton Road Associates LP v. Sunray Solar, Inc.*, Civil Action No. 10–5478 (FLW), 2011 WL 1375681 at *4, n.9 (D.N.J. Apr. 12, 2011).

*Metex* does not aid Montclair's cause. That case, unlike here, was a summary judgment disposition that summarily concluded—without addressing in its analysis—that the plaintiff's fraudulent inducement claim was extraneous to the performance of the parties' contract. 2008 WL 877870 at *4 ("Defendants invite this Court to rule that Metex's fraud claim involves an alleged fraud or breach that occurred only in the performance of the contract, and not in the inducement of the contract. The Court declines the invitation."). Moreover, a close reading of the facts suggests that the parties' contract did not expressly address the substance of the alleged misrepresentation. In *Metex*, the plaintiff, a manufacturer of wire mesh substrates, alleged that the defendant, a coater of such substrates, misrepresented its ability to coat the plaintiff's substrates in a manner that would

15

meet the plaintiff's specifications. *Id.* at *1. There is no mention by the *Metex* Court, however, that the parties' agreement expressly addressed the coating requirements. Rather, the facts state only that the contract consisted of a "series of purchase orders" that stated only that "[Metex] shall have all rights and remedies afforded by the [UCC] in effect in the [State of New Jersey]" and "contained a liability and indemnification clause, including the shifting of attorneys' fees in the event of injuries sustained by Metex or its clients resulting from MEC's breach of contract." *Id.* For this reason, I find *Metex* distinguishable on its facts as it did not involve a contract which expressly addressed the topic of the alleged misrepresentations.

Montclair, further, seizes on language in my prior decision in *Chen,* that "to falsely state that one intends to honor a promise is a misstatement of present fact and breaches a separate and extraneous duty not to commit fraud." 2010 WL 4721514 at *9 (citation omitted). However, Montclair omits language from the following paragraph of my decision holding that the plaintiff in that case "fail[ed] to sufficiently allege a fraud separate and distinct from the performance of the Employment Agreement" at issue in the case because "the Complaint specifically lists the paragraph of the Agreement under which Defendants' obligations arise." *Id.* Moreover, I reasoned in *Chen*, the fraudulent inducement claim incorporated allegations that took place after the contract had been signed. *Id.*

Like the plaintiff in *Chen*, Montclair's Amended Complaint relies on specific language in the parties' agreements as the basis for Oracle's duties to it, and incorporates post-agreement allegations. For example, in its price allegations, Montclair asserts that in Oracle's May 2008 best and final offer, "Oracle reduced their proposal to a fixed fee of $14,803,446 .... Ultimately, after further negotiations, Oracle and the University agreed to a fixed price for Oracle's implementation

16

services of $15,750,000." Am.Compl., ¶ 40.  Montclair additionally asserts that, at the time Oracle

made the alleged misrepresentation that it intended to perform the work for a fixed fee,  "Oracle

knew that its base system did not meet all of the requirements that Oracle said it would meet [and]

that it would be required to create and implement a substantial number of customizations of its base

system in order to provide the functionality it agreed to provide."  *Id.* at ¶ 41.  Notably, Montclair

continues:

> *During the implementation process*, however, Oracle demanded
> additional fees beyond the fixed fee for the customization work,
> contending erroneously that such customization work was beyond the
> scope of the original contract.  Thus, Oracle sought to use change
> orders to increase the fee the University was to pay by characterizing
> as new features functionality that Oracle represented was contained
> in its base system.

*Id.* at ¶ 42 (emphasis added).  Finally, Montclair asserts that Oracle "failed to meet the July 1, 2010

go- live date for the University's finance module," *id.* at ¶ 43, a deadline established by the parties'

agreement.  *See id.* at ¶ 51 (reciting the Financial Management System June 30, 2012 deadline set

forth in the FPE); *see also* FPE, Appendix E (setting forth timelines).  Because these allegations

refer to the contract language, and include references to Oracle's conduct during the implementation

of the parties' agreement, I conclude that, on balance, these allegations are better understood as

fraud-in-the-performance, as opposed to fraud-in-the-inducement, allegations.  *Accord Chen*, 2010

WL 4721514 at *7 n.7.[8]

---

[8]        Moreover, as I explained in *Chen*, a showing of non-performance will not suffice to
demonstrate that the promise to perform was fraudulent when made.  *Id.*  By the same token,
allegations that refer to conduct that took place after the contract was executed do not sufficiently
allege pre-contractual intent.  The key case that this Court's research revealed which sustained a
fraudulent inducement claim based on an alleged misrepresentation regarding a defendant's pre-
contractual statements involved a statement by a third-party indicating that the defendant never
intended to honor the agreement.  *See Lo Bosco v. Kure Engineering Ltd.*, 891 F.Supp. 1020, 1032-
33 (D.N.J. 1995).  Montclair has not made any such allegations relating to pre-contractual intent

Montclair also argues that the New Jersey decision in *Perth Amboy Iron Works, Inc. v. American Home Assur. Co.*, 226 N.J.Super. 200 (App. Div. 1988), makes clear that New Jersey courts "have rejected the application of the of the economic loss doctrine to fraud claims." Pl. Opp. at 12. While Montclair correctly notes that the New Jersey Supreme Court has yet to explicitly hold that the economic loss doctrine applies to fraud claims, the New Jersey Supreme Court's silence is simply that—silence. It does not mean that the New Jersey Supreme Court has held that the doctrine does *not* apply. *Accord Q Capital Corp. v. Wilmington Trust Co.*, 2007 WL 93231 (App. Div. 2007) ("[W]hether [a party] may seek to recover economic losses resulting from the performance of a contract based on breach of contract remedies and tort remedies, including fraud, is an open question."). As noted, in light of the Supreme Court's lack of guidance relating specifically to fraudulent inducement claims, and a similar lack of authority in the state appellate courts, this Court has chosen to follow the District of New Jersey cases applying the "extraneous to the contract" divining line. All of the above-cited district court cases holding that the economic loss doctrine bars non-extraneous fraudulent inducement claims were decided after *Perth Amboy*.

Finally, in deciding whether to allow fraudulent inducement claims to proceed alongside contract claims, at least one court has looked to whether the plaintiff is a commercial buyer or an individual. *See, e.g., Lo Bosco v. Kure Engineering Ltd.*, 891 F.Supp. 1020, 1033 (D.N.J. 1995). Here, there are two sophisticated parties who were represented by counsel at each stage of their relationship—from early negotiations through the termination of the agreement. When the agreement was drafted and finalized, Montclair had the opportunity to ensure that its concerns were fully protected by the terms of the agreement. Indeed, Montclair does not dispute the validity of the

here, which further calls into question whether its allegations could withstand Rule 9(b)'s heightened pleading standard.

agreement, or argue that its terms are unconscionable.  Moreover, the parties here bargained for specific remedies in their agreement.  As explained in more detail below, the agreement contains a limitation of liability clause that could serve to limit Montclair's damages.  Permitting Montclair to pursue its fraudulent inducement claim, which I construe as a fraud in the performance claim, would permit Montclair to recover remedies "beyond those embraced by the contract."  *Florian*, *surpa* at 528 (holding that fraud claim could proceed where there was *no* limitations of damages provision).[9]

Because I conclude that the economic loss doctrine bars Montclair's fraudulent inducement claim, I do not rely upon the integration clause found in the LSA.[10]  I note, however, that courts in this district have held that an integration clause will bar fraudulent inducement claims that are not based on duties extraneous to the parties' contract.  *See, e.g., RNC Systems, Inc. supra*, at *15-16; *Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.*, 357 F.Supp.2d 788, 798 (D.N.J. 2005).  Indeed, "New Jersey courts distinguish between fraud regarding matters expressly addressed in the integrated writing and fraud regarding matters wholly extraneous to the writing." *Travelodge*, 357

---

[9]     In its plea for damages, Montclair seeks the same damages for its fraud claim and breach of contract claims.  *See* Am.Compl., ¶ 152.

[10]     The integration clause provides, *inter alia*: "You agree that this agreement and the information which is incorporated into this agreement by written reference . . . , together with the applicable ordering document, are the complete agreement for the programs and/or services ordered by you, and that this agreement supercedes all *prior and contemporaneous* agreements or representations, written or oral, regarding such programs and/or services." LSA at 4, ¶ L (emphasis added).  Montclair argues that this language can not be read to incorporate the FPE, which is where the language expressly addressing subjects related to the alleged misrepresentations is found, because the FPE was executed on May 31, 2009, several months after the LSA was executed on February 29, 2009.  Montclair further argues that Amendment Two—which does not include an integration clause and states that it takes precedence over Amendment One, *see* Amendment Two at 6, ¶ 16—invalidates the integration clause.  I do not rule on these complex and intertwined contractual interpretation questions because I do not rely on the integration clause as a basis for my decision.  Nonetheless, in the ensuing paragraph, I explain that if the integration clause incorporates the FPE, it would likely serve to bar Montclair's fraudulent inducement claim.

F.Supp.2d at 798 (citing *Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 251 N.J.Super. 570, 598 A.2d 1234, 1236 (1991)).  Montclair's citation to the recently-decided case of *Walid v. Yolanda for Irene Couture, Inc.*, 425 N.J.Super. 171 (App. Div. 2012), rather than assisting Montclair, confirms that it is only in those cases where the contract does not expressly address the substance relating to the misrepresentation that an integration clause will not bar a fraud claim.  *See id.* at 186 (distinguishing *FilmLife*—which dismissed a fraudulent inducement claim in the face of an integration clause—where the contract in that case "expressly provided that the trade-in value would be utilized as a capitalized cost reduction" yet the plaintiff alleged that it was entitled to receive full trade-in value).  Fraudulent inducement claims survive integration clauses only "when the fraudulent misrepresentation inducing the signature is as to a thing not dealt with at all in the agreement."[11] *Filmlife*, 251 N.J.Super. at 575 (quoting *Schlossman's v. Niewinski*, 12 N.J.Super. 500 (App.Div. 1951)).[12]

　　B.　*Negligent Misrepresentation Claim*

"Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002).  In this connection, courts have noted that "the mere failure to fulfill obligations encompassed by the parties' contract is not actionable in tort." *Park v. M & T Bank*

---

[11]　For this reason, Montclair's citation to the Sixth Circuit decision in *American Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462 (6th Cir. 2004), is unhelpful to it.  *American Trim* relies on the California rule that parol evidence may be admitted where it is "relevant to prove a meaning to which the language of the instrument [was] reasonably susceptible."  *Id.* at 472 (quoting *Delta Dynamics, Inc. v. Arioto*, 69 Cal.2d 525, 72 Cal.Rptr. 785, 787, 446 P.2d 785 (1968)).  *Filmlife* makes clear, however, that courts should focus on whether the substance of the misrepresentation is "dealt with" in the agreement.  275 N.J.Super. at 575.

[12]　I also do not reach Montclair's Rule 9(b) argument, as I rest my holding on economic loss grounds.

*Corp.*, 2010 U.S. Dist. LEXIS 24905, at * 19 (D.N.J. Mar. 16, 2010) (quoting *Shinn v. Champion*

*Mortg. Co.*, 2010 U.S. Dist. LEXIS 9944, at * 12 (D.N.J. Feb. 5, 2010). As explained in my analysis

of Montclair's fraudulent inducement claim, the Amended Complaint relies upon obligations that

are created by the parties' agreement.[13] It follows, then, that Montclair's negligent misrepresentation

allegations are not premised on "an independent duty imposed by law." *Saltiel, supra* at 316.

Montclair argues that it need not plead any "special duty" because, in its view, as long as

Montclair alleges that it was a reasonably foreseeable recipient of Oracle's representations, and that

it relied upon the representations, its negligent misrepresentation claim may stand. Contrary to

Montclair's argument, however, in *Karu v. Feldman*, 119 N.J. 135 (1990), the New Jersey Supreme

Court made clear that it is not enough for the recipient of a negligent misrepresentation to simply

show that he was a reasonably foreseeable recipient. The recipient must still point to a duty to

disclose separate from the parties' contract. *Id.* at 148 ("[C]ourts have recognized a cause of action

based on negligent misrepresentation when a party fails to provide the correct information at a time

when it might affect future actions, *where there is a duty to disclose*.") (emphasis added). Thus, in

*Karu*, a case involving a banker who allegedly misrepresented the bank's policy on withdrawal

---

[13]    For example, in paragraph 129 of the Amended Complaint, Montclair alleges:

> As discussed in detail above, in its response to the RFP, in its product
> demonstration, and in meetings with MSU during the bidding
> process, Oracle made numerous misrepresentations of material facts
> about, among other matters, the number of the University's business
> requirements that were satisfied by its base product, the amount of
> customization that would be required to satisfy the University's
> business requirements, the quantity of the University's personnel and
> other resources that would be required to complete the project on the
> schedule proposed by Oracle.

Am.Compl., ¶ 129.

penalties for certificates of deposit ("CDs"), "[t]he issue . . . regarding disclosure [was] very narrow. Specifically, [the Court] consider[ed] whether *in addition to its otherwise-thorough disclosure, as evidenced by the contractual term printed on the CD* and the Bank's rules and regulations, the Bank had the further duty to apprise [the plaintiff] . . . of the various withdrawal penalties that could be imposed if at a later date he decided to alter the designation of the CDs." *Id.* (emphasis added). Because the bank complied with the federal and state disclosure rules, and "did not have the added duty of disclosing" to the plaintiff that he would be subjected to a penalty, the Court held that summary judgment was appropriate on the negligent misrepresentation claim  *Id.* at 148-51.

I do not suggest that *Karu* is on all fours with the case here.  My point is that *Karu* makes clear that, in determining whether a negligent misrepresentation claim is properly asserted, New Jersey courts "focus[ ] on the course of dealings between the parties and the express contractual undertaking" and will uphold a negligent misrepresentation claim alongside a contract claim where an independent duty exists. *Id.* at 150.  As Montclair has not pointed to any such independent duty, its negligent misrepresentation claim must be dismissed.

C.    *Breach of Contract Claims*

Oracle argues that Montclair's breach of contract claims must be dismissed because, despite their caption, they attempt to assert negligence claims not permitted by the economic loss doctrine. I disagree.  Count III is captioned: Breach of Contract (Grossly Negligent Performance of Contractual Obligations), and Count IV is captioned:  Breach of Contract (Willfull Anticipatory Repudiation of Contract).  It is apparent from reviewing the agreement that this claims were crafted to fit within the limitation of liability provisions set forth in the agreement.

The LSA specifically contains a limitation of liability provision that provides: "ORACLE'S MAXIMUM LIABILITY FOR ANY DAMAGES ARISING OUT OF RELATED TO THIS AGREEMENT . . . WHETHER IN CONTRACT OR TORT . . . SHALL BE LIMITED TO HE FEES YOU PAID ORACLE ...."  LSA at 4, ¶ M.  Importantly, Amendment One amends this language, adding that "The limitations stated in this section shall not apply [to] the indemnification obligations stated in this agreement or to damages resulting from acts of *gross negligence or intentional wrongdoing*."  Amendment One at 2, ¶ 6 (emphasis added).[14]  Reading the Amended Complaint allegations in light of Amendment One's exception to the limitation of liability provision for gross negligence or intentional wrongdoing makes it clear that Count III's reference to gross negligence is merely an attempt to invoke this contractual provision.  As for Count IV, it is axiomatic that anticipatory repudiation is a contract doctrine, thus, I see no basis for interpreting this

---

[14]     In addition, Amendment Two contains another limitation of liability provision that states:

> SUBJECT TO AND EXCEPT AS SET FORTH IN AMENDMENT ONE, NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, OR ANY LOSS OF PROFITS OR REVENUE.  SUBJECT TO AND EXCEPT AS SET FORTH IN AMENDMENT ONE, EACH PARTY'S MAXIMUM LIABILITY FOR ANY DAMAGES ARISING OUT OF RELATED TO THIS AGREEMENT OR YOUR ORDER TO THE OTHER, WHETHER IN CONTRACT OR TORT, OR OTHERWISE, SHALL BE PAYABLE TO ORACLE BY YOU UNDER THE FEES YOU PAID ....

Amendment Two at 2, ¶ 4.

breach of contract claim as sounding in negligence.  Accordingly, Counts III and IV will not be dismissed.[15]

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED as to Plaintiff's fraudulent inducement claim (Count I) and negligent misrepresentation claim (Count II), but DENIED with respect to Counts III and IV—the breach of contract claims.


Dated: August 23, 2012                                    /s/ Freda L. Wolfson
                                                          Freda L. Wolfson, U.S.D.J.

---

[15]     As a final matter, the Court notes that Oracle has also moved to strike a notice of supplemental authority filed by Montclair, alerting the Court to the Appellate Division decision in *Walid, supra*.  Oracle contends that the notice amounted to an unauthorized sur-reply brief.  In response, Montclair cross-moved for leave to file the notice/brief *nunc pro tunc*.  As noted, I do not find that *Walid* supports Montclair's arguments, thus, both Oracle's motion and Montclair's cross-motion are denied as moot.